### In re JACOBSON & PERRILL.

(District Court, N. D. Georgia.    October 22, 1912.)

### No. 539.

1. BANKRUPTCY (§ 200*)—CHATTEL MORTGAGE—LIEN—FILING.

Where a chattel mortgage executed by a bankrupt is filed for record before a bankruptcy petition is filed, it is prior to the lien of the trustee conferred by Bankr. Act July 1, 1898, c. 541, § 47, cl. 2, subd. "a," 30 Stat. 557 (U. S. Comp. St. 1901, p. 3438), as amended by Act June 25, 1910, c. 412, § 8, 36 Stat. 840 (U. S. Comp. St. Supp. 1911, p. 1500).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 289, 296–300, 306–316; Dec. Dig. § 200.*]

2. BANKRUPTCY (§ 161*)—UNRECORDED CHATTEL MORTGAGE—VALIDITY—"REQUIRED TO BE RECORDED."

Since failure to file a chattel mortgage under the Georgia law does not affect its validity as between the parties, or as against general creditors of the mortgagor having no lien, such mortgage is not one which is "required" to be recorded within Bankr. Act July 1, 1898, c. 541, § 60a, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1903, p. 416).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261–263; Dec. Dig. § 161.*]

3. BANKRUPTCY (§ 152*)—LIEN OF TRUSTEE—DATE.

The lien of a bankrupt's trustee conferred by Bankr. Act July 1, 1898, c. 541, § 47, cl. 2, subd. "a," 30 Stat. 557 (U. S. Comp. St. 1901, p. 3438), as amended by Act June 25, 1910, c. 412, § 8, 36 Stat. 840 (U. S. Comp. St. Supp. 1911, p. 1500), does not relate back to a period four months prior to the institution of bankruptcy proceedings, nor can it antedate the institution of such proceedings.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 194; Dec. Dig. § 152.*]

4. BANKRUPTCY (§ 184*)—LIEN CREDITORS—CHATTEL MORTGAGE.

Claimant sold a stock of goods to bankrupts under a contract providing for weekly payments. It also authorized the firm to make special sales for cash only, provided one-half of the amount received was paid on the purchase price of the stock in addition to the weekly payments, with certain exceptions. A mortgage was given to secure the purchase price, giving the bankrupts the right to sell in ordinary course of trade at retail, but providing that the mortgage should attach to and cover any and all goods added to the stock by way of replenishment. The mortgage

was executed June 27, 1911, but was not filed for record until the following November, and during the interim creditors with the mortgagee's knowledge were supplying new goods on the assumption that the bankrupts' stock was unincumbered. *Held*, that the mortgage, while free from fraud when executed, became fraudulent as to such creditors, and could not be enforced as against them.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 275–277; Dec. Dig. § 184.*]

In Bankruptcy. In the matter of bankruptcy proceedings of Jacobson & Perrill. On petition to review a referee's order allowing the claim of Goldstein Bros. and others as a secured and preferred claim. Reversed.

Tindall & Silverman, of Atlanta, Ga., for objecting creditors.
M. F. Goldstein, of Atlanta, Ga., for trustee.
Hatton Lovejoy, of La Grange, Ga., for mortgagee.

NEWMAN, District Judge. This is a petition to review the order of the referee allowing the claim of Goldstein Bros. as a secured and preferred claim.

[1] One question involved in this case is definitely settled by the decision of the Circuit Court of Appeals for this circuit in the case of Keeble v. John Deere Plow Co., 190 Fed. 1019, 111 C. C. A. 668. The decision is per curiam, and the only thing said in it is that "the conditional sale was recorded before the petition in bankruptcy was filed, and therefore is prior in time to any lien the trustee may have growing out of the adjudication in bankruptcy," and the petition to revise was denied. The case was reviewing a decision of the District Court for the Northern District of Texas, and in the opinion by Judge Meek, sitting in the District Court but not yet published, this was said:

"The recent amendment to the Bankruptcy Act provides: 'Trustees, as to all property in the custody or coming into the custody of the bankrupt court, shall be deemed vested with all the rights, remedies and powers of a creditor holding a lien by legal or equitable proceedings thereon. Section 47, clause 2 of subdivision A, as amended by the act of June 25, 1910.' The question arises as of what date the trustee should be deemed vested with these rights. There must be some point of time before which the rights did not accrue, and after which they are vested. There are obvious considerations tending to the conclusion that the intent was to vest the rights as of the date of the adjudication; for it may be seen that many petitions for involuntary bankruptcy are filed which are defeated and dismissed without an adjudication, and in such cases it would seem burdensome that the mere filing of a petition in bankruptcy, however unfounded the ground on which the proceeding may prove to be, should operate as a levy of legal process on all of the property of the person proceeded against. On the other hand, there are considerations leading to the conclusion that the intent was that the filing of a petition should constitute the equivalent of a levy and vest in the trustee to be subsequently appointed after and when he was appointed the right of a legal lien creditor by relation back as of the date on which the petition was filed. In this case, however, it is not necessary to determine whether the rights of the trustee are to be considered as having become vested on the date of the adjudication or on the date of the institution of the proceedings, for the facts in this case show that the instrument evidencing the claimant's liens had been duly filed before either of these dates.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"The question then occurs, Can these rights of the trustee be considered as having antedated the institution of the bankruptcy proceeding? I can find no reason for so holding. I can find no point of time prior to the institution of the bankruptcy proceedings which would determine the validity of such instruments by validating those filed prior to that time and invalidating those which should be subsequently filed, and to fix a date prior to the institution of the bankruptcy proceedings would be in effect to hold that such instruments were void for want of record as against the trustee in bankruptcy if not at once recorded, and such a holding would, in my opinion, fail to reflect the meaning of that portion of the bankrupt law quoted, supra, and conflict with the decisions of the Supreme Court of Texas on the meaning of the Registration Act. I therefore find that the contracts of the claimant were duly filed, and are not subject to the attack of the trustee for want of record. The effect of a failure to register such contracts before the institution of bankruptcy proceedings is not a question involved in this contest."

[2] It may be understood that the law of Texas with reference to the recording of a chattel mortgage is practically and substantially the same as in this state. That law is stated by Judge Pardee in the opinion of the Circuit Court of Appeals in a former case; that of Meyer Bros. Drug Co. v. Pipkin Drug Co., 136 Fed. 396, 69 C. C. A. 240. Judge Pardee states the statute of the state of Texas as construed by the Supreme Court of Texas in this way:

"This statute has been construed in the Supreme Court of the state of Texas to mean that an unrecorded chattel mortgage shall be void only against lien creditors of the mortgagor, or subsequent purchasers and mortgagees or lienholders in good faith; and, as between the parties to the chattel mortgage and against all ordinary creditors, the record is immaterial."

The statute of Georgia on this subject could be stated in exactly the same language.

[3] The decision of the Circuit Court of Appeals in Keeble v. John Deere Plow Co., the last case decided by it, is therefore controlling on this court on the question made as to when the judgment lien given the trustee by the act of 1910 takes effect. It is urged here that the lien relates back as of four months prior to the institution of the bankruptcy proceeding. The Circuit Court of Appeals in this decision clearly holds that such lien of the trustee cannot be considered to have taken effect prior at least to the institution of the bankruptcy proceeding. They, apparently, leave it an open question as to whether the date of this lien should be considered as of the time of the institution of the bankruptcy proceeding or of the time of the adjudication. In voluntary cases this would make little difference, but in involuntary cases it will become very material. It is unnecessary to determine that question, however, in this case, as the mortgage was filed for record some months before the commencement of the bankruptcy proceedings.

The decisions of the Circuit Court of Appeals above referred to must be taken as controlling, also, I think, upon the question as to whether mortgages in Georgia are "required" to be recorded. In the case of Meyer Bros. Drug Co. v. Pipkin Drug Co., supra, Judge Pardee states this question to be determined in this way: "This depends on whether or not the mortgage in question was one which was required by law to be recorded or registered"—the answer being that

it does not, as shown by the remainder of the opinion, and clearly by the headnote, as applicable to the facts of that case. It may be that the decisions cited by the diligent counsel for the creditors in this case are not in harmony with the decisions of our Circuit Court of Appeals; indeed, counsel state that in those decisions the courts declined to follow the decisions of our Circuit Court of Appeals. The cases cited by counsel are Bowler v. First National Bank, 21 S. D. 449, 113 N. W. 618, 130 Am. St. Rep. 725, First National Bank v. Connett, 142 Fed. 33, 73 C. C. A. 219, 5 L. R. A. (N. S.) 148, and Loeser v. Savings Deposit Bank, 148 Fed. 975. 78 C. C. A. 597, 18 L. R. A. (N. S.) 1233.

[4] Having disposed of the above questions, which it seems should be determined in favor of the mortgagee, the next question, and to my mind the controlling question in the case, is this: Can the mortgagee claim to be paid in preference to the general creditors in this case, or a large part of them at least? The bankrupt partnership, Jacobson & Perrill, bought of Goldstein Bros. a stock of goods in Carrollton, Ga., and moved the same to West Point, Ga., and put it into a stock the bankrupt firm had before in West Point, combining the two stocks. When the goods were delivered, a contract of sale was made, in connection with and a part of which was the mortgage involved here. The purchase price of the stock of goods was $5,913.50, the same being the amount of an inventory of the stock which had been taken, less 10 per cent. The contract between the parties provided that the purchase price of $5,913.50 should be paid as follows: Beginning October 1, 1911, $150 and each subsequent week thereafter until January 1, 1912, $150 per week. From January 1, 1912, and each subsequent week $50 until October 1, 1912, and each subsequent week thereafter $150 until January 1, 1913, and thereafter $50 per week until paid, unless the purchase price is sooner paid. The contract then provided that the bankrupt firm might make special sales, but that they should be for cash only, and one-half of the amount received in each of the special sales should at once be paid on the purchase price of the Goldstein stock, in addition to the weekly payments, except that the regular weekly payments should not be made for the time of the special sales if one-half of such special sales equaled the weekly payment. A mortgage was given to secure the amount of the purchase price in weekly payments for the amounts stated for the different periods. It gave the right to the purchasers to sell in ordinary course of trade at retail only, any goods so sold to be released from the provisions of the mortgage and that the lien of the mortgage should attach to and cover any and all goods and merchandise added to the stock of goods thereafter by way of accession or replenishment.

This mortgage by the bankrupts, Jacobson & Perrill, was made on June 27, 1911, and it was filed for record November 9 and recorded November 10, 1911. During this period between the execution and the record of the mortgage the referee finds that 30 creditors, giving their names and the amounts of their debts, sold goods which went into the stock of the bankrupt firm. He finds that four of these cred-

itors sold them goods after the mortgage was executed, and delivered and before it was recorded, and "that they did not know of its existence, and that should they have known of its existence, they would not have sold them goods." These four were evidently creditors who were there present at the time of the examination before the referee, or were there represented and an agreement was entered into with reference to them as to what is stated above; that is, that, if they had known of the existence of the mortgage, they would not have sold the goods. The others, so far as the record shows, would have made a similar statement had they been present and had the opportunity to do so. It appears, therefore, that a large proportion of the creditors, whose claims aggregate $3,177.59, sold goods to the bankrupt firm after the mortgage was executed, and before it was recorded. The evidence clearly discloses the fact that Goldstein Bros. knew that the bankrupt firm was purchasing new goods during this period. The contract of sale and mortgage itself shows that Goldstein Bros. expected Jacobson & Perrill to buy new goods. Goldstein Bros., notwithstanding this, stood by, without giving any notice whatever of the existence of their mortgage, and allowed these creditors to sell goods to Jacobson & Perrill upon the assumption and belief on the part of the sellers, so far as anything was disclosed to them, that Jacobson & Perrill owned the stock of goods in their store at West Point, and that it was unincumbered, this stock at West Point being all the time in the possession of Jacobson & Perrill.

Can Goldstein Bros. enforce this mortgage now against these creditors who were thus wrongfully treated in allowing them to sell goods without any knowledge of the existence of the mortgage? The law would work a great wrong if it allowed a mortgagee to stand by silently and let wholesale merchants sell goods to the mortgagor, place their goods in stock, the lien of the mortgage attaching thereto, and then foreclose and sell not only the old goods in stock, but what there may be of the new goods placed in the stock by innocent sellers. The period during which the mortgage was withheld from record was not so long in this case as it was in the case of Clayton v. Exchange Bank, 121 Fed. 630, 57 C. C. A. 656, decided in the Circuit Court of Appeals for this circuit, but the rule there laid down seems to me to be equally applicable here especially as that is a Georgia case. In concluding the opinion in that case, Judge Shelby says this, speaking of the bankrupt:

"He made new debts for goods, which, when bought, came under the two mortgages, and filed a petition to be adjudged a bankrupt, and on the same day and hour the mortgagee, being notified by telephone, filed the mortgages for record. We cannot avoid the conclusion that this conduct was unfair, unjust, and inequitable to the new creditors of the mortgagor, who were imposed upon by the apparent freedom from liens of all of Josephson's property. It is the peculiar province of courts of equity to grant relief in such cases. In this case it is equitable and just to reduce things to that condition which the bankrupt and the bank, through its officers, made the new creditors believe really existed, and that is done by denying the mortgages priority over the debts contracted by Josephson while the mortgages were withheld to give him fictitious credit."

See, also, In re Atlanta News Pub. Co. (D. C.) 160 Fed. 519; In re Hickerson (D. C.) 162 Fed. 345; In re Braselton (D. C.) 169 Fed. 960; Collier on Bankruptcy (9th Ed.) page 933 et seq.

Goldstein Bros. were business men of large dealings apparently. One of the Goldsteins in his testimony mentions the fact of taking a large number of mortgages, and that sometimes they record them and sometimes they do not. He clearly knew all about the necessity for recording mortgages; knew it in fact, without reference to the knowledge that the law imputes to him. The mortgagees were frequently in the store of the bankrupt firm at West Point, and knew about their dealings, and really knew as much about the business as Jacobson & Perrill did, or certainly could have known. A mortgage may be free from fraud in the beginning and may become fraudulent by the conduct and acts of the parties afterwards. Although Goldstein Bros. took this mortgage in good faith for a present consideration at the time it was taken, their subsequent action, or rather their nonaction and their silence when they should have spoken, must, in my opinion, render this mortgage invalid as against creditors who sold goods, and put them in the bankrupt stock before the record of the mortgage, and without knowledge of the existence of the same. I think it is perfectly clear from this record that the mortgage was intentionally withheld from record, and I am sure, further, that the effect of it was to deceive creditors, and that no creditor would have sold goods to the firm had he known that this mortgage was in existence. No good merchant, it seems to me, would have entertained the suggestion of such a sale with a knowledge of the true situation.

It is unnecessary to go at length into the authorities on the subject. I think it is perfectly clear that this mortgage cannot be enforced as against creditors who sold goods after it was executed and before it was recorded.

The action of the referee is disapproved, and he will proceed in accordance with the opinion herein expressed.